## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JOHN J. CUNNEY,                           *

    **Plaintiff**                              *

    **v.**                                     *          CIVIL NO. JKB-13-2519

PATRICK COMMUNICATIONS, LLC,              *
*et al.*,
                                               *

    **Defendants**                             *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM

John J. Cunney ("Plaintiff"), a citizen of Connecticut, brought an action in diversity[1]

against Patrick Communications, LLC ("PCL"), a limited liability company organized under the

laws of Maryland; W. Lawrence ("Larry") Patrick, a Maryland citizen and PCL principal; and

Larry's wife Susan Patrick, also a Maryland citizen and PCL principal (collectively,

"Defendants").  Plaintiff seeks to recover certain commissions he allegedly earned in his former

capacity as a vice president and broker at PCL.  Against PCL, Plaintiff brought claims sounding

in breach of contract and *quantum meruit*.  Against each Defendant, Plaintiff asserted violations

of the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann., Lab.

& Empl. §§ 3-501 *et seq.*; Plaintiff further accused each Defendant of "intentional

misrepresentation / fraud."  Finally, Plaintiff requested a declaratory judgment with respect to the

---

[1] *See* 28 U.S.C. § 1332(a) ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000 . . . and is between—(1) citizens of different States[.]").

ownership of an equitable interest in an entity formed for purposes of broadcast spectrum investment and arbitrage, NRJ TV, LLC ("NRJ" or the "NRJ Venture").[2]

Now pending before the Court is Defendants' Motion for Summary Judgment. (ECF No. 60.)[3] The issues have been briefed (ECF Nos. 60–1, 68–1 & 70), and no hearing is required, *see* Local Rule 105.6 (D. Md. 2014). For the reasons explained below, Defendants' motion will be GRANTED.

## I.    *Factual Background and Procedural Posture*

PCL is a brokerage firm specializing in "broadcast media, tower, telecom and wireless transactions." (ECF No. 60–3 ¶ 3.) The firm represents buyers and sellers in the purchase and sale of television and radio stations as well as wireless towers, telecommunications systems, and electromagnetic spectrum licenses. (*Id.* ¶ 5.) In April 2009, Plaintiff joined PCL as a vice president and commissioned broker: the basic terms of his employment are outlined in a memorandum drafted by Larry Patrick on March 13, 2009 ("Employment Memorandum"). (ECF No. 60–10 at 59.) Pursuant to that memorandum, Plaintiff was entitled to an annual base salary of $100,000 as well as commissions on certain transactions that he originated, executed, or assisted in executing to a reasonable degree. Specifically, Plaintiff was entitled to (1) 30% of all collected fees paid to PCL for telecom, wireless, or tower transactions that he originated *and* executed; (2) 30% of all collected fees for broadcast media transactions that he originated; and (3) 20% of all collected fees for broadcast media transactions that he executed or reasonably assisted in executing.    (*Id.*)[4]    The memorandum further specified that Plaintiff's

---

[2] The NRJ Venture actually involves four separate limited liability companies with identical operating agreements. (*See* ECF No. 66–1 at 4.) The Court refers to these entities collectively throughout this Memorandum.

[3] Also pending is Defendants' unopposed Motion to File Certain Documents Under Seal (ECF No. 62), which motion shall be GRANTED.

[4] These terms of art—"telecom, wireless, or tower transactions" and "broadcast media transactions"—are not defined in the Employment Memorandum.

telecom/wireless/tower commissions would increase to 40% once he generated $1 million in fees from originating such transactions; his broadcast media commissions would likewise increase to 40% once he generated $1 million in fees from originating those transactions.  (*Id.* at 60.)[5] Despite this seemingly attractive compensation package, Plaintiff earned just $10,365 in commissions during his first eighteen months at PCL.  (ECF No. 70–2 at 2.)

On March 17, 2010, the Federal Communications Commission ("FCC") unveiled a National Broadband Plan ("NBP"), a comprehensive roadmap to expanding broadband coverage and access that included as a goal the reallocation of electromagnetic spectrum to next-generation services.[6]  Under the NBP, the FCC determined to conduct a "reverse auction" at some unspecified date, acquiring spectrum from television stations in exchange for fees; the FCC would then conduct a "forward auction," licensing the newly reacquired spectrum to wireless service providers.  (ECF No. 60–3 ¶ 16.)  Larry Patrick avers that, upon learning about the NBP, he envisioned two distinct and potentially lucrative business opportunities—the first being an arbitrage opportunity whereby he and Susan could create an investment vehicle for the purpose of purchasing and holding underperforming television stations in advance of the reverse auction; the second being a marketing opportunity whereby PCL could sell its brokerage services to other investors who shared Larry's appetite for arbitrage.  (*Id.* ¶¶ 20-21.)  Thereafter, Larry reached out to two fellow businessmen with whom he had longstanding relationships:  Urchie Bertram ("Bert") Ellis, Jr., the president of Titan Broadcasting Management, LLC, a company that operates television stations nationwide; and Teddy ("Ted") Bartley, an employee at Fortress Investment Group ("Fortress"), a global investment firm.  (*Id.* ¶ 24.)  Together, Larry, Ellis, and

---

[5] The Employment Memorandum adds that the parties could "discuss moving the bar to 30 percent commission for deals when [Plaintiff] [was] involved in their execution based on [his] performance and success." (ECF No. 60–10 at 60.)

[6] *See* FCC, *Connecting America:   The National Broadband Plan* (2010), https://transition.fcc.gov/national-broadband-plan/national-broadband-plan.pdf.

Bartley (the "NRJ Partners") agreed to form a partnership—what would become the NRJ Venture—for the purpose of engaging in spectrum arbitrage.[7]

On August 13, 2010, the NRJ Partners met with representatives of Fortress to discuss the venture and the possibility of securing a loan facility from Fortress.  (*Id.* ¶ 25.)  Around that same time, as negotiations continued, Bartley contacted Plaintiff on several occasions seeking his input on spectrum valuation, but Larry instructed Plaintiff to refrain from providing any such information until a final deal was reached.  (*See* ECF No. 66–6 at 25-31.)  Plaintiff testified that he complied with Larry's instructions.  (ECF No. 60–10 at 7.)  Plaintiff further averred that on "October 8, 2010, Larry told [him] the deal was funded and the investment partnership, known as NRJ, was up and running."  (ECF No. 66–5 ¶ 29.)[8]  At that point, Plaintiff was free to supply Bartley and the other NRJ Partners (and Fortress) with spectrum valuation reports:  Larry viewed these reports as a "marketing tool that would lead to brokerage engagements for PCL," resulting in "substantial fees to PCL and, in turn, commissions to its brokers who executed or assisted in executing the specific television station sale[s] . . . which would include Plaintiff."  (ECF No. 60–3 ¶ 32.)

---

[7] In his opposition brief, Plaintiff's counsel takes issue with Larry Patrick's attestation that he was responsible for the concept that became NRJ.  Rather, Plaintiff's counsel contends that "it is [Plaintiff] who [was] suggesting the idea of acquiring broadcast properties for later spectrum sales, that eventually became the business of NRJ."  (ECF No. 68–1 at 14.)  Counsel bases this assertion off of a series of March 2010 e-mails which seem to indicate that (1) Plaintiff informed Larry that Plaintiff's clients were *not* interested in purchasing television stations at that time and (2) Plaintiff provided some basic information to Ted Bartley, who evidently was interested in acquiring stations. (ECF No. 66–6 at 11-16.)  These e-mails, which consist mainly of technical jargon, shed no significant light on whether Plaintiff or Larry first proposed the idea of engaging in spectrum arbitrage.  For that matter, Bartley testified in his deposition that it was *his* idea to "form a company, the objective or business of which would be to acquire stations for resale in the spectrum auction" (ECF No. 66–1 at 8), while Bert Ellis attributed the idea to the NRJ Partners collectively (ECF No. 70–6 ¶ 8).  In any event, assuming *arguendo* that Plaintiff initially floated the concept of spectrum arbitrage, the record shows that Plaintiff's involvement in the evolution of NRJ from a concept to a partnership was *de minimis* and that he was granted neither a stake nor any official role in the venture, *see* Part III.B.3, *infra*.

[8] This timeframe is consistent with Bert Ellis's declaration that "[b]y the end of September or early October 2010, the critical terms with Fortress were resolved and Fortress had agreed to fund [the] venture."  (ECF No. 70–6 ¶ 11.)

Although Bartley had at one point circulated a draft term sheet proposing that PCL could sign an exclusive brokerage agreement with NRJ in exchange for equity in the venture (ECF No. 66–6 at 66), no such agreement was ever executed (ECF No. 66–1 at 21).  Instead, as Bert Ellis explained, the three NRJ Partners themselves "agreed to an equal split of the NRJ equity because of the value [they] understood each of [them] inherently brought to NRJ through [their] knowledge, experience and relationships . . . and because [they] had jointly developed, created and formed NRJ and brought it to fruition."  (ECF No. 70–6 ¶ 15.)[9]  Bartley testified that Larry, in particular, received equity in NRJ because the two had a longstanding, valuable professional relationship.  (ECF No. 66–1 at 33.)[10]  The final operating agreement, which was executed on December 23, 2010, reflects the equal shares to which the NRJ Partners agreed:  each received one-third of membership units issued at the time of formation; Larry's units were allocated to Drumcree, LLC ("Drumcree"), a limited liability company that Larry co-owns with Susan.  (ECF No. 61 at 46.)[11]

Unlike the NRJ Partners, Plaintiff received no share of equity in NRJ as he "had no involvement in the creation, formation or capitalization of the venture."  (ECF No. 70–6 ¶ 12.)

---

[9] Ellis's attestation, which appears in a declaration dated March 16, 2016, differs somewhat from a statement he made in a prior affidavit dated February 25, 2015.  In that prior affidavit, Ellis suggested that the "agreement to share [NRJ's] profits equally was based on the contributions each [NRJ Partner] was to make to the venture" and that PCL, in particular, had "committed to give the venture a right of first look at any television stations it listed for sale."  (ECF No. 66–2 at 4.)  The Court initially found that statement puzzling, as Bartley testified that no exclusive agreement with PCL was ever reached and as there is no evidence of any such final agreement in the summary-judgment record.  However, Ellis explained the inconsistency in his March 2016 declaration.  He wrote that his prior affidavit had been drafted by Plaintiff's attorneys, that his lawyer did not review the affidavit before he signed it, and that he "did not give careful forethought to the meaning of phrases and terms used, and was too casual in accepting the language drafted by [Plaintiff's] attorneys."  (ECF No. 70–6 ¶ 3.)  Ellis concluded that the prior affidavit contains a "number of misstatements, mischaracterizations, and errors," and he directed portions of his March 2016 declaration to clarifying and correcting those errors.  (*Id.* at 2-3.)  Given Ellis's explanation of the circumstances surrounding his execution of the prior affidavit (which in any event would not have altered the Court's final analysis here), the Court takes that affidavit with a heap of salt.

[10] For his part, Larry opined that he received equity because he, "together with Bartley and Ellis, had devised and developed the idea of forming the NRJ investment entity, and convinced Fortress to capitalize the venture."  (ECF No. 60–3 ¶ 28.)

[11] Although the NRJ Partners (through their designees) each received a one-third equity interest in NRJ at the time of formation, that interest effectively amounted to a 5% fully diluted interest in the venture.  This is because Fortress's designee received warrants entitling it to acquire up to 85% of the authorized membership units.  (*Id.* ¶ 27.)

Even so, the venture redounded substantially to Plaintiff's economic benefit.  Whereas he had earned just $10,365 in commissions during his first eighteen months at PCL, he brought in $586,516 in commissions during his last eighteen months of employment, $306,400 of which amount was attributable to his work on NRJ transactions.  (ECF No. 70–2 at 2-3.)  In spite of these significant gains, Plaintiff began inquiring at an early stage about the possibility of receiving either equity in Drumcree or a cash payment upon final, post-auction liquidation of the NRJ Venture, either of which amount would be calculated based on the commission schedule laid out in the Employment Memorandum.  According to Plaintiff, on November 3, 2010, he asked Susan for a portion of Drumcree's equity as his commission, "just like any other deal." (ECF No. 66–5 ¶ 32.)  Plaintiff avers that Susan expressed "concerns about paying [him] a commission in equity," ostensibly because he might leave PCL before completing his work on NRJ transactions; however, he claims she "confirmed that [he] would get paid [his] percentage of any money they received in the future."  (*Id.*)

Plaintiff had subsequent conversations with both Larry and Susan about his desire for a profit share in NRJ.  On November 9, 2010, Plaintiff e-mailed a proposed "NRJ COMMISSION AGREEMENT" for Larry's review; Larry responded that the document "mis-states several key facts," and he did not sign it.  (*See* ECF No. 66–6 at 80-81.)  On November 28, 2010, Susan e-mailed Plaintiff to advise him that she had spoken with Larry at length about Plaintiff's proposed "deal"; that Larry was "willing to consider some sort of vesting in the NRJ stuff over time"; but that Larry felt it was "important that discussion of any vesting structure prior to just a simple payday at the end of the auction be tied to covering [their] investment in [Plaintiff] and some elements of financial performance."  (*Id.* at 82.)[12]  However, on December 10, 2010, Susan

---

[12] In her declaration, Susan explained that she and Larry "told PCL employees . . . that if the FCC conducted [the reverse auction] . . . and Larry and [she] received a substantial return on [their] NRJ equity, [they] might decide, at

sent Plaintiff another e-mail, asking to meet and advising him that Larry was "extremely annoyed and frustrated" with Plaintiff's proposed "deal." (*Id.* at 83.) According to Plaintiff, during their conversation, Susan told him they would "pay [him] when the deal 'closed[,]' which they considered was the time they received cash for their shares in NRJ," and she advised him not to press the issue. (ECF No. 66–5 ¶ 40.) It appears that the parties had no further discussion about Plaintiff's desire for a slice of NRJ's profits until Plaintiff's April 2012 exit interview, at which point he avers that Susan "told [him] since [he] was no longer employed, they would not have to pay [him] commissions for NRJ." (*Id.* ¶ 49.) In an e-mail following up on the exit interview, Plaintiff acknowledged that the parties were "not able to agree on the NRJ investment deal" and that, for the time being, he suggested they "agree to disagree on that matter." (ECF No. 66–6 at 86-87.)

In sharp contrast with Plaintiff's testimony, both Larry and Susan have consistently testified that they promised Plaintiff neither equity in Drumcree nor any kind of profit share in NRJ. Larry attested that

> [i]n or around late October or early November 2010, Plaintiff approached both Susan and [Larry] separately and requested that he be given an equity interest in NRJ. . . . Plaintiff . . . proposed that PCL enter into a written agreement, which would provide him with equity in NRJ at the same commission rate he received for broadcast media transactions under the [Employment] Memorandum. Both Susan and [Larry] explicitly rejected Plaintiff's request. Plaintiff continued to ask for equity in NRJ and, when repeatedly rebuffed, he asked for a cash payment in connection with the profitability of NRJ. Both Susan and [Larry] also rejected Plaintiff's requests for a cash payment in connection with the profitability of NRJ.

---

that time, to give bonuses to employees who were still employed by PCL." (ECF No. 60–4 ¶ 16.) In her deposition, Susan testified that Plaintiff had "asked whether he could start to vest in [the bonus immediately] instead of waiting until the [auction]" and that the two had a "fairly prolonged discussion about the fact that there would be a lot of issues that [Larry and Susan] would have to think about" before they would agree to such a structure. (ECF No. 60–14 at 15-16.) Susan stressed, however, that they were "not going to give [Plaintiff] equity. That was not even on the table at [that] point. He had already been told that that was never going to happen repeatedly." (*Id.* at 16-17.)

(ECF No. 60–3 ¶ 35.)  Susan made similar, unequivocal statements in her declaration (*see* ECF No. 60–4 ¶ 15), and Greg Guy, a PCL broker, recalled a "couple of instances" in which the Patricks informed Plaintiff that he was "not going to receive a commission" with respect to the formation and capitalization of NRJ (ECF No. 70–5 at 3).

Despite his April 2012 proposition that the parties should "agree to disagree," Plaintiff filed suit on August 29, 2013, bringing claims sounding in breach of contract (Count I) and *quantum meruit* (Count II) against PCL; charging each Defendant with violating the MWPCL (Count III); and requesting a declaratory judgment as to the equitable ownership of Drumcree (Count IV).[13]   (*See* ECF No. 1.)   Plaintiff later amended his Complaint ("First Amended Complaint") to plead a claim against each Defendant for "intentional misrepresentation / fraud" (Count V).  (*See* ECF No. 57.)  On February 12, 2016, Defendants filed their pending Motion for Summary Judgment.  (ECF No. 60.)  Plaintiff opposed Defendants' motion (ECF Nos. 66 & 68),[14] and Defendants replied (ECF No. 70).  The motion is ripe for adjudication.

## II.   Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a).  No genuine issue of material fact exists if the opposing party fails to make a sufficient showing on an essential element of his case as to which he would have the

---

[13] Plaintiff does not specifically reference Drumcree in his First Amended Complaint; rather, he refers to a "Carried Interest" in NRJ.  (*See* ECF No. 57 ¶ 47.)  The Court declines to adopt Plaintiff's nomenclature, as the term "Carried Interest" connotes a profit share paid to a general partner as compensation for managing an investment, *see Interest*, *Black's Law Dictionary* (10th ed. 2014).  That is an inaccurate characterization of Larry Patrick's stake in NRJ, which, as discussed below, is not contingent on Larry's provision of services for the venture.

[14] In a March 11, 2016, notice, Plaintiff's counsel advised the Court that he had encountered "extraordinary technical difficulties in the preparation of [his] Opposition, resulting in numerous typographical errors."  (ECF No. 68 at 1.)  Counsel provided a corrected version of his opposition brief along with a redline version.  (*See* ECF Nos. 68–1 & 68–2.)  The Court has consulted Plaintiff's corrected brief in conducting its analysis, and all relevant citations herein are to that document.

burden of proof. *Celotex Corp.*, 477 U.S. at 322-23. The "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The facts themselves, and the inferences to be drawn therefrom, must be viewed in the light most favorable to the party opposing summary judgment. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008). Even so, the opponent may not rest upon the mere allegations or denials of his pleading but must instead set out specific facts, supported by evidentiary materials, showing a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits must be made on personal knowledge with such facts as would be admissible in evidence and must affirmatively show the competence of the affiant to testify to the matters stated therein. Fed. R. Civ. P. 56(c)(4).

### III.  Breach of Contract Claim Against PCL (Count I)

#### A.  Legal Principles

##### 1.  Choice of Law

"A federal court sitting in diversity is required to apply the substantive law of the forum state, including its choice-of-law rules." *Francis v. Allstate Ins. Co.*, 709 F.3d 362, 369 (4th Cir. 2013). Maryland courts apply the rule of *lex loci contractus*, which requires that "the construction and validity of a contract be determined by the law of the place of making of the contract." *Am. Motorists Ins. Co. v. ARTRA Grp., Inc.*, 659 A.2d 1295, 1300 (Md. 1995); *see also Konover Prop. Tr., Inc. v. WHE Assocs., Inc.*, 790 A.2d 720, 728 (Md. Ct. Spec. App. 2002) ("For choice-of-law purposes, a contract is made where the last act necessary to make the contract binding occurs."). In this case, although neither party disputes that the Employment Memorandum is a valid and enforceable agreement that governed Plaintiff's employment

relationship with PCL,[15] the memorandum itself is unsigned: the Court presumes, in the absence of any argument or evidence to the contrary, that Plaintiff impliedly accepted the terms of the memorandum through his subsequent performance.  *See Sharp Elecs. Corp. v. Deutsche Fin. Servs. Corp.*, 216 F.3d 388, 393-94 (4th Cir. 2000).  Since PCL's offices are located in Maryland, and since Plaintiff moved from Connecticut to Maryland in order to commence his employment with PCL, the Court assumes that (1) he accepted Defendants' offer in Maryland and (2) Maryland law therefore controls.  Moreover, while the parties do not specifically address the choice-of-law question in their briefs, both parties rely on case law authored by courts sitting in Maryland.  Under such circumstances, the Court may appropriately apply Maryland law.  *See Chambco v. Urban Masonry Corp.*, 659 A.2d 297, 299 (Md. 1995) ("Where the parties to an action fail to give . . . notice of an intent to rely on foreign law . . . a court in its discretion . . . may presume that the law of [an] other jurisdiction is the same as Maryland law."); *see also Howes v. Wells Fargo Bank, N.A.*, Civ. No. ELH-14-2814, 2015 WL 5836924, at *24 (D. Md. Sept. 30, 2015) (applying the *Chambco* presumption); *Kent Constr. Co. v. Glob. Force Auction Grp., LLC*, Civ. No. TJS-12-2839, 2015 WL 5315565, at *3 (D. Md. Sept. 10, 2015) (same); *Danner v. Int'l Freight Sys. of Wash., LLC*, 855 F. Supp. 2d 433, 447-48 (D. Md. 2012) (same).

---

[15] Larry Patrick testified that the Employment Memorandum, a copy of which is appended to both parties' briefs (*see* ECF Nos. 60–10 at 59-60 & 66–6 at 1-2), represented Plaintiff's employment offer.  (ECF No. 60–9 at 3.)  For his part, Plaintiff cited the memorandum as containing the "terms and conditions" of his employment (ECF No. 57 ¶ 13); he also identified the memorandum as the "final offer [he] received," and he testified that he believes the memorandum entitles him to a commission from NRJ (ECF Nos. 60–10 at 3 & 70–8 at 17).

In his opposition brief, Plaintiff's counsel proposes that "the terms of the Memorandum were not the exclusive terms and conditions under which [Plaintiff] worked at PCL" and that "[m]any types of services for which he was compensated were not mentioned in it at all."  (ECF No. 68–1 at 12.)  In support of this assertion, counsel cites paragraph 42 of Plaintiff's Affidavit; the Court assumes counsel intended to cite paragraph 43, as paragraph 42 is inapposite.  In paragraph 43, Plaintiff attested that the "memorandum of the terms of [his] employment . . . covered a broad range of activities not necessarily specifically identified in the language of the memorandum."  (ECF No. 66–5 ¶ 43.)  In other words, Plaintiff does not dispute that the Employment Memorandum governed his employment relationship with PCL: he simply believes that the language should be construed more broadly than Defendants propose.  As discussed in detail below, the Court ultimately adopts Defendants' interpretation for purposes of resolving the instant dispute, but the Court hastens to emphasize that the parties are in apparent agreement as to the enforceability and applicability of the Employment Memorandum.

### 2.    *Maryland's Law of Contract Enforcement and Interpretation*

To prevail in an action for breach of contract, a plaintiff must prove "that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001).   Under Maryland law, the proper interpretation of a contract is a question of law for the Court to resolve; the "purpose of contract interpretation is to determine and effectuate the intent of the parties, and the primary source for identifying this intent is the language of the contract itself."   *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 260 (4th Cir. 2005).   Thus, in analyzing contract terms, Maryland courts adhere to the doctrine of objective contract interpretation:   "[t]he written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite understanding."   *Dumbarton Improvement Ass'n v. Druid Ridge Cemetery Co.*, 73 A.3d 224, 232 (Md. 2013) (alteration in original) (quoting *Slice v. Carozza Props., Inc.*, 137 A.2d 687, 693 (Md. 1958)).   Courts will deem a contract ambiguous only if, from the perspective of a reasonably prudent person, the contract is "susceptible of more than one meaning.   The determination of whether language is susceptible of more than one meaning includes a consideration of "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution[.]"   *Calomiris v. Woods*, 727 A.2d 358, 363 (Md. 1999) (citations omitted).   An ambiguity "'does not exist simply because a strained or conjectural construction can be given to a word.'   Nor does an agreement become ambiguous merely because two parties, in litigation, offer different interpretations of its language."   *Huggins v. Huggins & Harrison, Inc.*, 103 A.3d 1133, 1140 (Md. Ct. Spec. App. 2014) (alteration in original) (quoting *Dumbarton Improvement Ass'n*, 73 A.3d at 233).

Where certain words or terms take on a specific trade usage in a particular industry, it is "competent for the parties to a contract in which such words and terms are used to show the peculiar meaning of them in the business or trade to which the contract relates," not for the purpose of modifying the contract but rather for the purpose of "elucidating the language used as a means of enabling the court to interpret the contract language according to the intention of the parties." *8621 Ltd. P'ship v. LDG, Inc.*, 900 A.2d 259, 269 (Md. Ct. Spec. App. 2006) (quoting *Della Ratta, Inc. v. Am. Better Cmty. Developers, Inc.*, 380 A.2d 627, 635 (Md. Ct. Spec. App. 1977)); *see also* Restatement (Second) of Contracts § 202(3) (Am. Law Inst. 1981) ("Unless a different intention is manifested . . . technical terms and words of art are given their technical meaning when used in a transaction within their technical field."); *cf. Calomiris*, 727 A.2d at 363 ("[W]hile evidence of prior intentions and negotiations of the parties is inadmissible, the parol evidence rule would not bar a court from considering the context of the transaction or the custom of the trade in a determination of ambiguity.").

## B.   The NRJ Venture

In his First Amended Complaint, Plaintiff proclaims that, as "originator and procuring cause" of the NRJ Venture, he is contractually entitled to a commission equal to 40% of the profits PCL will receive upon liquidation of the venture.  (ECF No. 57 ¶¶ 29, 37.)[16]  Plaintiff's contract claim fails for three independent reasons:  (1) the formation of NRJ did not constitute a broadcast media transaction as that term is understand in the media brokerage industry; (2) PCL neither received nor is entitled to receive any payment associated with the formation of NRJ or

---

[16] In his draft First Amended Complaint, Plaintiff had lowered this figure from 40% to 30%.  (*See* ECF No. 49–2 at 15.)  The Court disallowed Plaintiff's extensive, eleventh-hour revisions to his Complaint, permitting instead only the inclusion of Count V for intentional misrepresentation / fraud.  (*See* ECF No. 55.)  However, the Court here observes that Plaintiff is no more entitled to 30% of Larry Patrick's stake in the NRJ venture than he is to 40%.

the ultimate liquidation of the venture; and (3) in any event, the record evidence flatly contradicts Plaintiff's notion that he was the "originator and procuring cause" of the venture.

### 1.    *The Formation of NRJ Was Not a Broadcast Media Transaction*

As noted above, Plaintiff was entitled, pursuant to his Employment Memorandum, to commissions on two (and only two[17]) classes of transactions:   telecom/wireless/tower transactions that he originated *and* executed; and broadcast media transactions that he originated *or* executed *or* assisted in executing to a reasonable degree.   (ECF No. 60–10 at 59.)[18]   The Employment Memorandum, which is admittedly a rather spare document, does not define "broadcast media transaction," and Plaintiff testified that he does not recall any discussions with Larry or Susan Patrick concerning the meaning of the term (*id.* at 4).   In the absence of an express definition in the contract, and given that the document relates to a professional relationship in a particular, highly technical, industry, the Court may properly consider extrinsic evidence of industry usage strictly for the purpose of understanding the parties' objectively manifested intent.   *See 8621 Ltd. P'ship*, 900 A.2d at 269; *Calomiris*, 727 A.2d at 363.

---

[17] In his opposition brief, Plaintiff begins his legal argument with a misstatement, writing that he was "employed by PCL as a commissioned broker, and pursuant to the terms of his employment he is entitled to receive a percentage of any fees or other compensation received by PCL from his activities." (ECF No. 68–1 at 34.) That is plainly not what the Employment Memorandum prescribes:  rather, Plaintiff was *only* entitled to commissions to the extent that he originated or executed specified transactions.

Plaintiff later presents his argument from a slightly different angle, contending that he was "in fact paid for a wide variety of transactions and services not expressly included in the original Memorandum." (*Id.* at 37.) Plaintiff enumerated certain of these transactions and services (which included consulting projects, appraisals, and credit reviews) in his affidavit. (*See* ECF No. 66–5 ¶ 43.) Assuming the truth of Plaintiff's attestation, it appears that PCL generously overcompensated him—but that certainly does not entitle him to *additional* unearned funds. *Cf. Mazer v. Safeway, Inc.*, Civ. No. AW-03-3650, 2005 WL 3803372, at *12 (D. Md. Oct. 27, 2005) (citing the "long-standing rule that no enforceable contractual obligation arises when an employer offers an employee a bonus for doing that which an employee is already required to do"). While parties to an employment contract might theoretically modify the contract's express terms through an extended course of dealings, the NRJ Venture was, so far as the Court can tell, a one-of-a-kind transaction—and the Court is disinclined to map the parties' interactions involving discrete, small-scale transactions conducted during the ordinary course of PCL business onto a unique investment scheme that existed entirely outside PCL.

[18] Plaintiff does not contend that the formation of NRJ was a telecom/wireless/tower transaction, which it plainly was not by any reasonable construction of those terms.

Defendants' expert witness, George R. Reed (a media broker and consultant with over forty-three years of experience in the broadcasting industry) opined that the term "broadcast media transaction" refers to the "purchase or sale of a broadcast property, such as a radio or television station, and in certain transactions the arrangement of financing for the purchaser."[19] (ECF No. 60–15 at 10.)  Reed explained that the "NRJ Transaction was not the purchase or sale of a broadcast property" but was instead the "creation, formation and funding of a new entity . . . that had a business plan to purchase television stations"—purchases that "occurred after NRJ was formed and a funding arrangement with Fortress established and were totally separate from the NRJ Transaction."  (*Id.*)  Plaintiff's expert, Brian Byrnes, did not contradict Reed's definition:  on the contrary, Byrnes testified that a "broadcast media transaction is where a station is purchased or sold, a broadcast station.  That's it."  (ECF No. 60–16 at 9.)  He further concurred with defense counsel that the mere act of forming a company that may engage in the purchase and sale of broadcast stations does not, by itself, constitute a broadcast media transaction.  (*Id.* at 9-10.)[20]

In his opposition brief, Plaintiff does not introduce evidence tending to discredit the experts' definition of "broadcast media transaction," nor does he offer a competing definition of

---

[19] The Court recognizes that, in a sense, the agreement by Fortress to fund the NRJ Venture was a kind of financing arrangement for an entity that would eventually purchase television stations.  Had Plaintiff played an instrumental (or even material) role in securing Fortress's commitment to the venture, the analysis here might be different.  But as discussed in Part III.B.3, *infra*, Plaintiff's contribution to the NRJ Venture before Fortress and the NRJ Partners reached an agreement in principal was *de minimis*, and his contribution afterward (*i.e.*, through the submission of spectrum valuation reports) was keyed to specific transactions rather than to securing general funding or broad capital commitments.

[20] In his expert report, Byrnes elaborated that the "purchase[] and subsequent sale of television stations owned by the NRJ entities, including any sale of spectrum rights at Auction or otherwise, are 'broadcast media transactions' as that term is commonly used and understood in the broadcast media brokerage industry."  (ECF No. 66–4 at 7.)  Byrnes's understanding of broadcast media transactions is entirely consistent with Defendants' theory of the case: the parties agree that PCL (and, indirectly, Plaintiff) was entitled to compensation to the extent that PCL brokered deals on behalf of NRJ.  But that is an entirely different proposition from Plaintiff's notion that he earned a commission for whatever role he thinks he played in the initial formation and capitalization of NRJ.  The difference is significant:  a commission on subsequent transactions would be calculated based on the fee PCL generates from each transaction; a commission on NRJ *per se* would be calculated (according to Plaintiff's theory) based on the venture's eventual profits, which Plaintiff estimates may exceed $100,000,000.

that term of art.   Instead, he observes that the word "transaction" (by itself, without any modifiers) can refer to the "act or an instance of conducting business or other dealings;" "[s]omething performed or carried out;" and "[a]ny activity involving two or more persons." (ECF No. 68–1 at 36 (citing *Transaction*, *Black's Law Dictionary* (10th ed. 2014).)   "A reasonably prudent person," Plaintiff muses, "would therefore have a broader understanding of 'transaction' than the mere purchase and sale of certain items."   (*Id.*)   But, of course, the Employment Memorandum does not make the payment of commissions contingent on the performance of *transactions*; rather, it entitles Plaintiff to commissions only where he performs *specified* transactions.   Plaintiff's preferred interpretation of "broadcast media transaction" would strip the qualifying language of meaning, violating the cardinal tenet that "[c]ontract terms must be construed to give meaning and effect to every part of the contract," *United States v. McLaughlin*, 813 F.3d 202, 204 (4th Cir. 2016) (quoting *Goodman v. Resolution Tr. Corp.*, 7 F.3d 1123, 1127 (4th Cir. 1993)).

Plaintiff complains that Defendants' interpretation of the NRJ transaction is "hyper-technical":   in his view, "[s]egregating the formation of the entity from its revenue producing activities is the ultimate Shylockian triumph of form over substance." (ECF No. 68–1 at 35.)   Not so.   The decisions that parties to a commercial venture make during the formation stage— such as how the venture will be structured, who is entitled to an equitable stake and on what terms, how the project will be capitalized, and so forth—are legally significant and independent from decisions the parties subsequently make in their capacity as partners in an established enterprise.[21] Because the formation of NRJ was not a broadcast media transaction, Plaintiff is not entitled to a commission based on the equity Larry Patrick received as a partner in NRJ.

---

[21] Further, to call the distinction "Shylockian" is to miss the point that PCL (and Plaintiff) benefited financially to the extent that PCL brokered deals on behalf of NRJ.

### 2.   The Formation of NRJ Generated No Fees for PCL

Even were the Court persuaded that the formation of NRJ somehow amounted to a broadcast media transaction, the Court would still conclude that Plaintiff is not contractually entitled to a commission for his (limited) involvement with that transaction.  This is so because (1) the transaction generated no fees for PCL but (2) Plaintiff's Employment Memorandum bases his commissions on "collected fees paid to [PCL]."  (ECF No. 60–10 at 59.)  Forty percent (or thirty percent) of $0 is $0.

In an effort to avoid this arithmetical quandary, Plaintiff attempts to argue that Larry's equity (through Drumcree) was a *de facto* fee payable to PCL for the brokerage services PCL would eventually perform on behalf of the venture.[22]  The first and most obvious problem with this argument is that it is belied by the NRJ operating agreement and the financing agreement between NRJ and Fortress.  These lengthy, comprehensive documents include no reference to PCL's services or, for that matter, PCL itself.  The operating agreement assigns 50,000 Class B membership units to Drumcree (ECF No. 61 at 46);[23] the financing agreement enumerates conditions precedent to the agreement's effectiveness and conditions precedent and subsequent to the issuance of loans, yet it makes no loans conditional on performance by PCL (ECF No. 61–1 at 52-58).  Moreover, each NRJ Partner has testified that Larry (through Drumcree) received his equity interest in consideration for his partnership and not as compensation for the future

---

[22] Plaintiff writes that the "only thing of value PCL received for its contributions to NRJ was its equity position entitling it to a 1/3 share of the profits."  (ECF No. 68–1 at 26.)  Plaintiff is mistaken.  In his declaration, Larry Patrick explained PCL's lucrative arrangement with NRJ:

> To best position PCL to broker stations to NRJ, [Larry] agreed that PCL would assist NRJ in identifying the key markets to purchase stations, and then identify stations within those markets to target for purchase.  PCL would seek to obtain a listing agreement with the owners of the identified target stations (sellers) to act as their broker in the sale of the station to NRJ, for which PCL would be paid a fee by the seller to handle the sale.  If NRJ purchased a station that had been identified by PCL, but the station's seller had not retained PCL as its broker, NRJ agreed that it would pay PCL a percentage fee for the transaction.

(ECF No. 60–3 ¶ 31.)
[23] The operating agreement also provided that, with a narrow exception for certain excess tax payments, no member was obligated to contribute any capital to the NRJ Venture.  (ECF No. 61 at 24.)

services of his firm.  Larry himself attested that "Drumcree . . . received the equity in NRJ because [he], together with Bartley and Ellis, had devised and developed the idea of forming the NRJ investment entity, and convinced Fortress to capitalize the venture."  (ECF No. 60–3 ¶ 28.) Susan echoed Larry's sentiment, adding that she and Larry were "not required to perform any services to NRJ or Fortress to receive or retain [the] equity interest in NRJ" (ECF No. 60–4 ¶ 13); Susan further testified that "Ted Bartley, Larry Patrick, and Bert Ellis were going to be given equity for bringing the idea to Fortress" and that "the equity was given to them without regard to anything that they were going to do subsequent to that" (ECF No. 60–14 at 4).  Ellis averred that "[e]ach of the NRJ Partners had the capability to provided needed services to assist NRJ in the acquisition, operation and ultimately sale of the acquired television stations and/or their spectrum" but that the "one-third equity interest received by each of the NRJ Partners was not in consideration for providing [such] services to NRJ."  (ECF No. 70–6 ¶¶ 14-15.)  Rather, each of the NRJ Partners "vested in their respective equity interest in NRJ at the time NRJ was formed."  (*Id.* ¶ 15.)  Finally, Bartley affirmed that there was "no agreement that Larry and Susan Patrick and Patrick Communications would receive equity interest in the payment of commissions for doing work for NRJ":  simply put, "[t]hat agreement does not exist."  (ECF No. 66–1 at 33.)

True enough, Plaintiff has managed to adduce *some* flimsy evidence in support of his *de facto* fee theory.  He cites two vague e-mails drafted by Larry in July and early September 2010 that could be read to suggest that Larry initially contemplated PCL would receive equity in the venture.  (*See* ECF No. 68–1 at 39-40.)  He also references an undated, unexecuted term sheet drafted by Ted Bartley:  paragraph 4 of the term sheet reflects that PCL would "sign an exclusive agreement with [NRJ] where [PCL] [would] show any and all potential TV station acquisition

opportunities in the Top 100 markets . . . during the five year period October 1, 2010—September 30, 2015," in exchange for "1/3 of the mgmt equity of [NRJ subsidiaries]."  (ECF No. 66–6 at 66.)   At first blush, the term sheet seems helpful for Plaintiff's position.   But on deposition, Bartley explained that "there were changes that were made between this term sheet and the legal documents."   (ECF No. 66–1 at 21.)   He elaborated that "there was never an exclusive agreement signed," that "[paragraph] 4 did not take," and that paragraph 4 "did not get reduced to a legal agreement."   (*Id.*)   Bartley's testimony is consistent with Ellis's declaration that "[a]lthough each of the NRJ Partners informally agreed to provide services to NRJ and discussed the nature and scope of the services, [they] never reached or signed any formal written agreement obligating any of [them] to provide [such] services."   (ECF No. 70–6 ¶ 16.)   On the contrary, the "NRJ Partners agreed to an equal split of the NRJ equity because of the value [they] understood each . . . inherently brought to NRJ through [their] knowledge, experience and relationships . . . and because [they] had jointly developed, created and formed NRJ and brought it to fruition."   (*Id.* ¶ 15.)

Given the overwhelming evidence that (1) PCL did not in fact take equity in the NRJ Venture and (2) the parties understood that their relationship was with Larry as a coequal partner, not with his brokerage firm, Plaintiff cannot create a genuine issue of material fact by citing a couple of ambiguous e-mails and a draft document that was never executed.  Since PCL received no payment in connection with the formation and capitalization of NRJ, Plaintiff has no contractual right to commissions based on Larry's stake in the venture.

### 3.   *Plaintiff Was Neither the Originator nor the Procuring Cause of NRJ*

Plaintiff is not entitled to a commission with respect to the formation of NRJ because that undertaking neither constituted a broadcast media transaction nor generated fees for PCL.   But

Plaintiff's breach-of-contract theory is more deeply flawed still because he misapprehends his role in the NRJ Venture.  While the parties do not dispute that Plaintiff made some contributions to the venture as a going concern (primarily through his spectrum valuation reports),[24] there is scant evidence in the summary-judgment record supporting Plaintiff's contention that he was the "procuring cause" of the venture *per se*.  On the contrary, the relevant parties have consistently testified that Plaintiff had little or no role during the crucial formative stages of the venture.  Ted Bartley, for instance, testified that he does not believe he ever spoke with Plaintiff regarding the NRJ concept before he decided to implement it; he was also unaware of any situation in which, "prior to Fortress making its decision to fund NRJ . . . anyone from Fortress ever spoke with [Plaintiff] regarding the idea of the formation or funding of NRJ."  (ECF No. 66–1 at 34.)  In Bartley's words, "[t]his transaction would have happened with or without [Plaintiff]."  (*Id.* at 33.)  Bert Ellis similarly averred that Plaintiff had "no involvement in the creation, formation or capitalization of the venture that became NRJ."  (ECF No. 70–6 ¶ 12.)  Joshua Pack, Fortress's representative during the NRJ negotiations, testified that he was not even sure he knew who Plaintiff was before Fortress made its funding commitments; Pack further denied that he and his fellow decision-makers relied on Plaintiff's advice in determining whether to fund the venture.  (ECF No. 60–12 at 6-7.)  And Plaintiff himself testified that (1) at Larry Patrick's direction, he refrained from sharing spectrum valuation information with Bartley until the NRJ deal was "in place" and (2) he "never really saw the actual [NRJ] formation documents."  (ECF No. 60–10 at 6-7, 39.)

As Defendants' expert, George Reed, explained, to "originate" a transaction in the media brokerage industry is to "be key to the decision of the seller or buyer client to engage the

---

[24] It appears, however, that these spectrum valuation reports required relatively little time and effort to prepare. Plaintiff submitted approximately fifteen reports over a period of eighteen months (ECF No. 60–13 at 5), spending roughly a day on each (ECF No. 60–10 at 20); by Plaintiff's own admission, the reports were largely boilerplate (*id.* at 22-23).

brokerage company to represent its interests"; the originator must therefore "identify the potential client" and may also be responsible for "negotiating the terms of an acceptable representation agreement between the client and the brokerage firm." (ECF No. 60–15 at 10-11.)[25]  In light of the foregoing, Plaintiff clearly played no such role in the transaction at issue here.[26]

### C.   WTVE

While the thrust of this litigation concerns Plaintiff's belief that he is entitled to equity in Drumcree or a percentage of NRJ's eventual profits, Plaintiff also alleges that he was undercompensated on a somewhat related but much smaller transaction:  the January 2011 sale of WTVE in Philadelphia to NRJ, for which transaction PCL received a fee of $638,000. Plaintiff perceives that he was the "procuring cause" of the deal (ECF No. 66–5 ¶ 57) and that he consequently should have received a commission based on his 40% origination rate; he believes the $163,400 commission he actually received was $63,659 short.  (ECF No. 57 ¶ 33.)

In his deposition, Larry Patrick testified that he met with Dick French, the former owner of WTVE, in June 2010; they had a "protracted conversation" about French's plans for his

---

[25] Plaintiff's expert proffered no definition of this term.

[26] Indeed, given Plaintiff's *de minimis* role, the Court is highly skeptical whether it can even be said that Plaintiff reasonably assisted in the execution of NRJ's formation.  While Plaintiff's expert, Brian Byrnes, opined that Plaintiff "'executed' and/or 'assisted in executing to a reasonable degree' the purchase of broadcast properties by NRJ for eventual resale" (ECF No. 66–4 at 8), that statement does not materially advance Plaintiff's position, as the parties do not dispute that Plaintiff participated in brokering deals for NRJ (for which participation he received substantial remuneration).

  Further, to the extent that Byrnes's opinion could be read to bolster Plaintiff's argument (on this point or on any other), the Court has significant reservations about the evidentiary value of that document.  In his deposition, Byrnes admitted that he had reviewed neither the First Amended Complaint nor the answers to interrogatories nor the deposition transcripts nor any of the documentary evidence:  instead, Plaintiff's counsel "just told [him] the basics of the case and that was it." (ECF No. 70–7 at 13-14.)  Moreover, Plaintiff's counsel drafted the Factual Background of the purported expert opinion and a substantial portion of the Summary of Opinions, though Byrnes "put in some words or sentences or whatever." (*Id.* at 15.)  Critically, the Explanation of Opinions (the substantive analytical portion of the document) was "basically" counsel's work product, though Byrnes "did add some words and partial sentences and whatever." (*Id.* at 16.)  However, Byrnes added "nothing that changed the meaning." (*Id.*) Finally, Byrnes admitted that he did not know "whether the testimony of the witnesses support[s] the evidence" but was making a "total assumption, based on what [counsel] told [him]." (*Id.* at 21.)  While the Court does not undertake to assess witness credibility at the summary-judgment stage, it need not turn a blind eye to patent evidentiary defects and admissions by the witnesses themselves as to the deficiencies in their testimony.  In light of Byrnes's admissions, the Court concludes that Plaintiff cannot establish a genuine issue of material fact through the contents of his expert report.

station.  (ECF No. 60–9 at 9.)  Larry had represented a bankruptcy trustee several years earlier in

the transaction through which French acquired the station, so Larry had significant preexisting

familiarity with the asset.  (*Id.*)  According to Larry, French indicated that he wanted to think

things over; during the months that followed, he and Larry spoke "numerous times."  (*Id.* at 10.)

Then, on November 17, 2010, in response to an e-mail from Plaintiff identifying "good

candidates for incentive auctions" (which e-mail identified a separate Philadelphia station but did

not identify WTVE), Larry advised Plaintiff that "Dick French . . . owns the Reading, PA station

[*i.e.*, WTVE] in the Philadelphia market" and that Plaintiff should "[g]o for both."  (ECF No.

66–6 at 91.)  Thereafter, Plaintiff "acted as the messenger to get [the listing agreement] signed."

(ECF No. 60–9 at 11.)

Nothing in Plaintiff's testimony, and no other evidence in the summary-judgment record,

undercuts Larry's recollection of the circumstances surrounding the WTVE transaction.  In fact,

Plaintiff admitted that Larry informed him about the possibility of a WTVE deal.  (ECF No. 66–

5 ¶ 53.)  In his affidavit, Plaintiff noted that "[a]s far as [he] kn[e]w, the only role Larry played in

the transaction was suggesting . . . that Mr. French also owned WTVE (*id.* ¶ 56)—but Larry's

deposition paints a clearer picture of the transaction beyond the scope of Plaintiff's subjective

knowledge at the time he executed his affidavit.  And while Defendants' expert opined that Larry

"would be considered the originator of [the] WTVE transaction because of his long-standing

relationship with Mr. French . . . and the fact that he identified WTVE as a potential target . . .

and had the initial conversations with Mr. French about selling the station" (ECF No. 60–15 at

11), Plaintiff's expert offered no opinion on the transaction whatsoever.

Plaintiff, however, need not despair:  it turns out that he was actually overcompensated

for his work on WTVE.  Pursuant to the Employment Memorandum, Plaintiff was entitled to a

20% commission on broadcast media transactions that he executed.  (ECF No. 60–10 at 59.)  On a $638,000 transaction, Plaintiff would have received $127,600 at the 20% rate.   The Employment Memorandum included an incentive (*i.e.*, a commission increase from 30% to 40%) once Plaintiff generated $1 million in fees from broadcast media transactions that he *originated*, and it left open the possibility of a similar incentive (*i.e.*, a commission increase from 20% to 30%) for transactions that he *executed* (*id.* at 60):  however, as of January 2011, Plaintiff had not yet reached his $1 million target (ECF No. 60–9 at 15).   Nevertheless, because Plaintiff was "struggling," Larry aggregated Plaintiff's telecom/wireless/tower and broadcast media transactions, which aggregation—combined with the $638,000 Plaintiff brought in on WTVE— pushed him over the $1 million threshold.  (*Id.*)  Accordingly, Larry paid Plaintiff a commission of 20% on the first $280,000 of PCL's fee (or $56,000), and 30% on the remaining $358,000 (or $107,400), for a total payment of $163,400—$35,800 more than Plaintiff would have received at the 20% rate.  (*See id.* at 32.)

Based on this record, no reasonable factfinder could conclude that Plaintiff originated the WTVE transaction:  what is more, Plaintiff was overpaid for executing the transaction.  For those reasons, and because (as discussed above) Plaintiff is contractually entitled to no commission with respect to the formation of NRJ, the Court will grant JUDGMENT AS A MATTER OF LAW to PCL on Count I.

## IV.   *Intentional Misrepresentation / Fraud Claims Against Each Defendant (Count V)*

In his First Amended Complaint, Plaintiff alleges that the Patricks "repeatedly told Plaintiff he would receive his contractually mandated commissions as compensation for his work in fulfilling Defendant PCL's obligations with respect to the NRJ venture" and that such representations "included promises that Plaintiff would receive his percentage of any interest to

which Defendants were entitled in the NRJ venture . . . and [] would receive such compensation at the time such interests or profits were received by Defendants." (ECF No. 57 ¶¶ 51-52.) According to Plaintiff, the Patricks in fact had "no intention of providing any share of [their equitable] interest to Plaintiff" but "deliberately misled him into performing those services they believed were necessary to obtain" their equitable interest. (*Id.* ¶ 55.) Such conduct, Plaintiff concludes, constitutes fraud.

To prevail on a fraud theory under Maryland law,[27] the plaintiff must prove that

> (1) a representation made by a party was false; (2) its falsity was known to that party or the misrepresentation was made with reckless indifference to truth; (3) the misrepresentation was made for the purpose of defrauding the plaintiff; (4) the plaintiff relied upon the misrepresentation and had the right to rely upon it with full belief of its truth; and (5) [] the plaintiff suffered damage directly resulting from the misrepresentation.

*Dean v. Beckley*, Civ. No. CCB-10-297, 2010 WL 3928650, at *4 (D. Md. Oct. 1, 2010) (citing *Suburban Props. Mgmt., Inc. v. Johnson*, 204 A.2d 326, 329 (Md. 1964)). Moreover, the plaintiff must prove each of these elements with clear and convincing evidence. *Price v. Berman's Auto., Inc.*, Civ. No. 14-763-JMC, 2015 WL 5720429, at *4 (D. Md. Sept. 28, 2015).[28] Although at the summary-judgment stage the Court must view the facts and reasonable inferences to be drawn therefrom in the light most favorable to the nonmoving party, *Scott*, 550 U.S. at 378, the Court must nevertheless consider the plaintiff's ultimate evidentiary burden in determining whether there is a genuine issue of material fact to hold over for trial. The court

---

[27] As with Plaintiff's contract claim, his fraud claim—which sounds in tort—requires a choice-of-law analysis. However, the analysis is comparatively simple. In tort cases, "Maryland applies the maxim of *lex loci delicti*—the law of the place of the harm—to determine the applicable substantive law." *Young v. Swirsky*, Civ. No. GLR-14-3626, 2015 WL 6501164, at *6 (D. Md. Oct. 26, 2015) (citing *Hauch v. Connor*, 453 A.2d 1207, 1210 (Md. 1983)). Here, the allegedly fraudulent conduct arose in the context of Plaintiff's employment relationship with PCL. In the absence of argument from either party, the Court presumes that any harm Plaintiff might theoretically have suffered occurred in Maryland (where PCL's offices are located). The Court will therefore apply Maryland law.

[28] Though the "clear and convincing" evidentiary standard evades easy definition, section 1:13 of the *Maryland Civil Pattern Jury Instructions* (promulgated by the Maryland State Bar Association) offers helpful guidance: "To be clear and convincing, evidence should be 'clear' in the sense that it is certain, plain to the understanding, and unambiguous and 'convincing' in the sense that it is so reasonable and persuasive as to cause [one] to believe it."

must therefore "view the evidence presented through the prism of the substantive evidentiary burden"; accordingly, the "clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions." *Anderson*, 477 U.S. at 254-55; *see also Skrzecz v. Gibson Island Corp.*, Civ. No. RDB-13-1796, 2015 WL 370049, at *3 (D. Md. Jan. 27, 2015) ("At the summary judgment stage, a plaintiff must 'set forth specific facts showing that there is a genuine issue for trial,' rather than [] speculation and beliefs . . . . Moreover, any evidence of fraudulent intent must be scrutinized under the clear and convincing evidence standard, as it is the standard applied at trial." (citation omitted)); *Wright Sols., Inc. v. Wright*, Civ. No. CBD-12-178, 2013 WL 1702548, at *8 (D. Md. Apr. 18, 2013) ("On a motion for summary judgment . . . the Court must consider whether a fair-minded jury could find that Plaintiff has proven . . . fraud clearly and convincingly.").

In their brief in support of their Motion for Summary Judgment, Defendants concede— *strictly* for purposes of the instant motion—that there is a "dispute of material fact with respect to the first two elements of Plaintiff's fraud claim," *i.e.*, whether the Patricks made false statements knowingly or with reckless disregard for the truth. (ECF No. 60–1 at 46.) The Court deems this concession rather generous: there is strikingly little evidence in the summary-judgment record to support Plaintiff's allegation that the Patricks lied. In fact, aside from Plaintiff's self-serving affidavit and deposition testimony,[29] the only evidence that could possibly be construed as supporting his claim appears in the form of a few highly ambiguous e-mails. In one such e-mail,

---

[29] Although Rule 56 of the Federal Rules of Civil Procedure certainly permits parties to support their claims and defenses with, *inter alia*, affidavits and declarations, such statements—without corroborating evidence—are disfavored as mechanisms for defeating a summary-judgment motion. *See Williams v. Lazer Spot, Inc.*, Civ. No. BPG-13-1850, 2014 WL 5365581, at *3 (D. Md. Oct. 21, 2014) ("Without further evidence, self-serving testimony is insufficient to defeat summary judgment."); *Singletary v. Allstate Ins. Co.*, No. 2:12-cv-940-RMG, 2013 WL 6145277, at *6 (D.S.C. Nov. 21, 2013) ("A self-serving affidavit, without more, is not sufficient to defeat summary judgment."); *accord Nat'l Enters., Inc. v. Barnes*, 201 F.3d 331, 335 (4th Cir. 2000); *Bellows v. Darby Landscaping*, Civ. No. WDQ-15-885, 2016 WL 264914, at *5 (D. Md. Jan. 21, 2016); *Flood v. Univ. of Md. Med. Sys. Corp.*, Civ. No. GLR-12-2100, 2014 WL 7363237, at *6 n.3 (D. Md. Dec. 23, 2014).

Larry Patrick *rejected* Plaintiff's draft "NRJ COMMISSION AGREEMENT" as "mis-stat[ing] several key facts" (ECF No. 66–6 at 80); in another, Susan Patrick merely acknowledged that Larry was willing to consider "some sort of vesting in the NRJ stuff over time" (*id.* at 82).[30] Plaintiff himself admitted in his deposition that the parties "never came up with an agreement" and that "eventually Susan told [him] that [he] needed to stop asking for it." (ECF No. 70–8 at 19.)  As for the Patricks, both flatly denied that they ever promised Plaintiff any equity in NRJ or any share in the profits they would ultimately enjoy on liquidation of the enterprise.  (*See* ECF Nos. 60–3 ¶ 35 & 60–4 ¶ 15.)  The Patricks' position is corroborated by the testimony of Greg Guy, who recalled a "couple of instances" in which the Patricks told Plaintiff that he was "not going to receive a commission" with respect to the formation and capitalization of NRJ.  (ECF No. 70–5 at 3.)  While there is no question that the parties have presented conflicting accounts (under oath, no less) of the representations that the Patricks made, the Court doubts that a rational factfinder could find *clear and convincing evidence* that the Patricks made false statements.[31]

Regardless, even assuming that the Patricks knowingly or recklessly made false representations, Plaintiff cannot prevail on his fraud claim unless he also proves (clearly and convincingly) that (1) the Patricks acted with the specific intent to defraud him and (2) he reasonably and justifiably relied on the misrepresentations, suffering damages thereby.  With respect to the fraudulent intent element, Plaintiff has essentially conflated that element with the first element of the tort.  In response to defense counsel's query about Plaintiff's "factual basis

---

[30] Given the ambivalence and equivocation in these e-mails (both of which were drafted roughly eighteen months before Plaintiff left his employment at PCL), Plaintiff's claim that he reasonably relied on the allegedly false statements seems tenuous at best.  Given the value inherent in the NRJ Venture, one would think a savvy businessperson in Plaintiff's position would have insisted on reducing any oral assurance of a future commission to writing.

[31] The Court stresses that the burden ultimately rests on Plaintiff to prove his claim, and specifically to prove that the Patricks lied; the burden does *not* rest on the Patricks to prove that they spoke truthfully (or did not in fact make the false statements of which they are accused).  Plaintiff's ultimate burden is an onerous one, but that is entirely appropriate, for he has accused the Patricks of grave misconduct.

for [his] assertion that Larry Patrick made [false] representations to induce [him] to perform . . .

services," Plaintiff replied:

> Larry Patrick told me that we were working on this transaction and that I would
> be compensated—that we would be compensated for the transaction, and I would
> receive my commission.  During his [deposition] testimony he stated that he never
> had any intention of paying me for this . . . project.  And so he was knowingly—
> based on his own statements, he was knowingly and intentionally lying to me in
> order to get me to work on the transaction.

(ECF No. 60–10 at 46-47.)  The problem with Plaintiff's characterization of Larry's testimony is

immediately apparent upon review of the context.  At no point during his deposition did Larry

acknowledge (or even hint) that he lured Plaintiff to perform services with the promise of a

substantial payout:  rather, Larry testified that he "told [Plaintiff] numerous times" that he was

"never going to get equity."  (ECF No. 60–9 at 20.)  In other words:  Larry did not admit (as

Plaintiff now posits) that he made a promise he never intended to keep; rather, Larry insisted (as

he has done throughout this litigation) that he *never made any such promise at all*.[32]  As for

Susan, Plaintiff's fraud case against her is weaker still:  on deposition, when asked about the

factual basis supporting his claim, he conclusorily asserted that the "facts that [he] ha[d] are the

fact that she made statements to [him] that induce[d] [him] to perform spectrum analysis and

other work on this transaction."  (ECF No. 60–10 at 51.)  Plaintiff cannot create a genuine issue

of material fact simply by parroting an element of his cause of action under oath.

Moreover, it is not enough for Plaintiff to prove false and fraudulent statements:  he must

also prove that he "reasonably acted in reliance upon the misrepresentation with full belief in its

truth, and he would not have done the thing from which damage resulted had it not been made,"

*Todd v. Xoom Energy Md., LLC*, Civ. No. GJH-15-154, 2016 WL 727108, at *9 (D. Md. Feb. 22,

---

[32] Larry addressed this very point in his declaration, stating that his deposition testimony "should not be read as . . .
implying that [he] had promised Plaintiff equity but never intended to deliver; rather, as [he] explicitly testified, [he]
never made any such promise of equity or commissions to Plaintiff."  (ECF No. 60–3 ¶ 37.)

2016) (quoting *Learning Works, Inc. v. Learning Annex, Inc.*, 830 F.2d 541, 546 (4th Cir. 1987)). And it is on this reliance element that Plaintiff's fraud claim (whatever is left of it) falls apart. Plaintiff complains that he was "required to provide virtually unlimited consulting services . . . without an expectation of being paid a commission"; he considers this a "self-serving, unilateral, retroactive and unannounced change in the basic nature of [his] employment." (ECF No. 68–1 at 49.)  But this complaint is meritless for several reasons.  First, as discussed above, Plaintiff was compensated handsomely for the brokerage services he provided for NRJ (which became, for all intents and purposes, a client of PCL).  In addition to his $100,000 annual salary, the commissions that Plaintiff earned on NRJ projects alone totaled $306,400, a significant increase from the paltry $10,365 that he earned during his first eighteen months on the job. (*See* ECF No. 70–2.)  Second, while Plaintiff testified on deposition that he "didn't work on any transactions—or [didn't] recall ever doing anything material that would not—was not at least somewhat expected to . . . directly lead to a commission" (ECF No. 60–10 at 47-48), he admitted in that same deposition that he invested time and energy in at least one non-NRJ project (a pitch to Verizon Communications) that yielded no fees for PCL and that resulted in no commission for him (*id.* at 38).  Plaintiff later engaged in the following colloquy with defense counsel:

> COUNSEL:  You put together an analysis and a pitch to try to get business, you present it to someone, and hope that they'll give you business that may generate a commission.

> PLAINTIFF:  I market my services to potential customers, and I market my services differently to different types of customers.  But yes, I market my services to customers and hope that they will hire me and I can generate revenue.

> COUNSEL:  Okay.  And in marketing your services . . . you may do some analysis to show that you can provide . . . the potential customer with some value so the customer may then enter into a transaction for which you will generate a fee.  Correct?

> PLAINTIFF:  In some situations with some clients I will do analysis and share it with them.

(*Id.* at 55-56.)  In light of Plaintiff's testimony, the Court struggles to grasp how Plaintiff's research and marketing tasks on the NRJ deal (and particularly the spectrum valuation reports that he spent a relatively *de minimis* amount of time working on) fell outside the scope of Plaintiff's duties even as he understood them.  These tasks certainly fell within the ambit of Plaintiff's job as Larry and Susan Patrick have described it[33] and as Defendants' expert understood it.[34]

Finally, Plaintiff has adduced absolutely no evidence that he was *damaged* by the allegedly false statements on which he supposedly relied.  Although Plaintiff's counsel passingly asserts in his brief that "in the face of the FCC's implementation of the [NBP], [Plaintiff's] expertise and valuation services would have been in high demand by others seeking to do the same thing as NRJ" (ECF No. 68–1 at 50), he provides no support for that statement.  He identifies no missed opportunities, no jobs or contracts Plaintiff turned down in favor of PCL;

---

[33] According to the Patricks, the job duties of a PCL broker include marketing PCL's services and negotiating with potential buyers and sellers; researching market and station data and performing valuation analyses; handling all aspects of broadcast media and wireless transactions on behalf of clients; and providing consulting services to potential and existing clients.  (ECF Nos. 60–3 ¶ 7 & 60–4 ¶ 7.)  Because marketing is an "essential part of PCL's brokerage business," the firm does not charge clients for all services provided:  research, analysis, and valuations are frequently performed *gratis*.  (*Id.*)

[34] George Reed opined that the "preparation of reports, such as the market spectrum reports, is work that [Plaintiff] would have been expected to perform in the ordinary course of his duties as an employee-broker . . . regardless of the use to which [PCL] intended to put those reports."  (ECF No. 60–15 at 12.)  Reed added that he found it "significant" that Plaintiff received a guaranteed annual salary of $100,000; evidently, most media brokers operate on a 100% commission basis, yet are still expected to engage in marketing activities for which they receive no further compensation.  (*Id.* at 12-13.)  "Clearly," Reed concluded, Plaintiff's "preparation of the market spectrum reports would not have been a separately compensable service."  (*Id.* at 13.)

   Plaintiff's expert, Brian Byrnes, also addressed this issue:  in his report, he made the peculiar statement that an "employer *cannot* avoid paying commissions to an employee who assists to a reasonable degree in the execution in [*sic*] broadcast media transactions generating substantial future revenue otherwise subject to payment of a commission, merely by treating such work as an ordinary and regular part of his job for which he is paid a salary."  (ECF No. 66–4 at 10 (emphasis added).)  Presumably, an employer *can* require his employees to perform any number of tasks so long as the employer honors the terms of the employment contract and abides by relevant law.  In any event, Byrnes's report (the evidentiary value of which is suspect, *see supra* note 26) does not bolster Plaintiff's argument here, as there is no evidence in the summary-judgment record that Plaintiff was denied any commissions on transactions that he executed *and that* produced fees for PCL.

indeed, the Court can only speculate as to (1) whether any other opportunities might have hypothetically been available to Plaintiff or (2) whether, if no such opportunities were available, Plaintiff nevertheless would have abandoned his lucrative post at PCL had he known he was not entitled to a slice of equity in his client, NRJ. The Court appreciates that the nonmovant is entitled on summary judgment to the benefit of every *reasonable*, factually grounded doubt—but Plaintiff cannot survive summary judgment through "mere speculation or the building of one inference upon another," *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

The Court concludes that Plaintiff has adduced insufficient evidence to proceed to trial on his fraud theory. This conclusion, though likely disheartening to Plaintiff, should come as no surprise to him: in its Memorandum of November 5, 2015, the Court stressed that Plaintiff *barely* satisfied the pleading requirements for his fraud claim, and it allowed the claim to proceed to supplemental discovery *only* because of the relatively lenient standard of review for motions to amend. (*See* ECF No. 54 at 15.) It seems that supplemental discovery yielded meager fruit— and while Plaintiff's fraud count might possibly have survived were his ultimate burden of proof a mere preponderance of the evidence, no reasonable factfinder could identify clear and convincing evidence of fraudulent misrepresentation in this record. Accordingly, Defendants are entitled to JUDGMENT AS A MATTER OF LAW on Count V.

## V.   *Ancillary Claims (Counts II–IV)*

Having disposed of Plaintiff's primary breach-of-contract and fraud theories, the Court briefly turns its attention to his three remaining counts.

In Count II (as an alternative to his breach-of-contract theory in Count I) Plaintiff proposes that his work conferred "substantial and material benefits" on PCL "for which Plaintiff has received no compensation." (ECF No. 57 ¶ 39.) He seeks to recover the "fair value of the

services rendered" on a theory of *quantum meruit*.   Much of the discussion in Parts III–IV, *supra*, concerning Plaintiff's involvement with NRJ and his compensation for media deals that he actually brokered, is germane here as well; his suggestion that he received "no compensation" for his efforts is simply incorrect.   But the Court need not belabor the point.   Plaintiff's *quantum meruit* theory fails under the long-established principle that "'*quantum meruit* is not applicable when compensation of the parties is covered by an express written contract.' . . . [W]here an actual promise to pay . . . exist[s], there is no need to imply one."   *Mass Transit Admin. v. Granite Constr. Co.*, 471 A.2d 1121, 1126 (Md. Ct. Spec. App. 1984) (citation omitted); *see also Hammons v. NVR, Inc.*, Civ. No. WMN-14-1673, 2015 WL 1129834, at *9 (D. Md. Mar. 11, 2015) ("Courts, both state and federal, have consistently held that unjust enrichment claims are barred where there is a valid and enforceable contract governing the same subject matter as the unjust enrichment or quasi-contract claim."); *cf. Cty. Comm'rs v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 600, 610 (Md. 2000) ("Parties entering into a contract assume certain risks with the expectation of a beneficial return; however, when such expectations are not realized, they may not turn to a quasi-contract theory for recovery." (citation omitted)).   While Plaintiff correctly observes that Maryland courts have recognized *narrow* exceptions to this general bar on *quantum meruit* in contract cases, *see id.* at 608-09, the exceptions on which Plaintiff would rely have no application on these facts.[35]   And while Plaintiff has identified two cases in which

---

[35] Maryland courts will bypass the general rule and permit quasicontractual claims "when there is evidence of fraud or bad faith, there has been a breach of contract or a mutual rescission of the contract, when rescission is warranted, or when the express contract does not fully address a subject matter."   *Cty. Comm'rs v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 600, 608-09 (Md. 2000) (footnotes omitted).   Plaintiff invokes two of these exceptions:  the fraud / bad faith exception and the subject matter exception.   As for fraud / bad faith, this exception is only available in cases in which the plaintiff alleges "fraud or bad faith in the *formation* of the contract," *Combs v. Bank of Am, N.A.*, Civ. No. GJH-14-3372, 2015 WL 5008754, at *6 (D. Md. Aug. 20, 2015) (emphasis added) (quoting *Jones v. Pohanka Auto N., Inc.*, 43 F. Supp. 3d 554, 573 (D. Md. 2014)).   Plaintiff makes no such allegation here, and there is certainly no evidence to suggest that the formation of this employment agreement was tainted by employer misconduct.   As for subject matter, nothing in the Employment Memorandum suggests that the parties intended it to govern only some subset of transactions for which Plaintiff might be compensated:  the only reasonable

courts sitting in this District allowed *quantum meruit* counts to proceed alongside breach-of-contract counts at the pleading stage, those cases are readily distinguishable.[36]  Plaintiff has proffered no persuasive justification for replacing the plain terms of his employment contract with a quasicontractual remedy:  accordingly, PCL is entitled to JUDGMENT AS A MATTER OF LAW on Count II.

In Count III, Plaintiff accuses each Defendant of violating the MWPCL:  he seeks wages due and owing plus treble damages.  (ECF No. 57 ¶ 45.)  The MWPCL provides that "if an employer fails to pay an employee in accordance with [the statute], after 2 weeks have elapsed from the date on which the employer is required to have paid the wages, the employee may bring an action against the employer to recover the unpaid wages."  Md. Code Ann., Lab. & Empl. § 3-507.2(a).[37]  Since the Court has concluded, based on the allegations in Plaintiff's First Amended Complaint and the evidence in the summary-judgment record, that Defendants owe Plaintiff no outstanding wages, his MWPCL claim must fail.  Consequently, the Court will grant JUDGMENT AS A MATTER OF LAW to Defendants on Count III.

Finally, in Count IV, Plaintiff invokes the federal Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201, and asks the Court to "adjudge and declare the rights of the parties to the ownership of the equity interests herein described" (ECF No. 57 ¶ 48), *i.e.*, Drumcree's stake in NRJ as designee for Larry Patrick.  Under the DJA, in a case or controversy within the Court's

---

interpretation of the document is that it reflects the parties' integrated agreement with respect to the terms and conditions of Plaintiff's employment, including those circumstances under which he might earn a commission.  In hindsight, Plaintiff may wish he had driven a harder bargain, but that is of no moment here.

[36] In both cases—*Beznenova v. Ocwen Financial Corp.*, Civ. No. 8:13-cv-00003-AW, 2013 WL 3863948 (D. Md. July 23, 2013); and *MTBR LLC v. D.R. Horton, Inc.*, Civ. No. RDB-07-3363, 2008 WL 3906768 (D. Md. Aug. 22, 2008)—the parties disputed whether the alleged contract that paralleled the plaintiff's quasicontractual count was itself valid and enforceable.  There is no such dispute here:  on the contrary, even in his *quantum meruit* count, Plaintiff proposes that the "fair value of the services rendered by [him] was established by the *employment agreement written by the Defendant* and by the course of business dealing between them" (ECF No. 57 ¶ 41 (emphasis added)).

[37] The statute defines a "wage" as "all compensation that is due to an employee for employment."  Md. Code Ann., Lab. & Empl. § 3-501(c)(1).

jurisdiction and upon the filing of an appropriate pleading, the Court "*may* declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." § 2201(a) (emphasis added).  The DJA has "long been understood 'to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants.'"  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 136 (2007) (citation omitted).  In this case, declaratory judgment is unnecessary, as Plaintiff cannot withstand summary judgment on the dispositive liability issues and is therefore entitled to no redress. Moreover, declaratory judgment would be improper in the current posture, as Drumcree is not a party to these proceedings.  Accordingly, the Court will DISMISS Count IV with PREJUDICE.

## VI.   Conclusion

For the foregoing reasons, an Order shall enter GRANTING Defendants' Motion for Summary Judgment; entering JUDGMENT FOR PCL on Counts I–II of the First Amended Complaint; entering JUDGMENT FOR DEFENDANTS on Counts III & V of the First Amended Complaint; DISMISSING Count IV of the First Amended Complaint with PREJUDICE; and CLOSING THIS CASE.

DATED this 13th day of June, 2016.

BY THE COURT:

_____/s/_____
James K. Bredar
United States District Judge