IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JOHN J. CUNNEY, | * | |
| Plaintiff | * | |
| v. | * | CIVIL NO. JKB-13-2519 |
| PATRICK COMMUNICATIONS, LLC, *et al.*, | * | |
| | * | |
| Defendants | | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM AND ORDER

On June 13, 2016, the Court entered an Order granting the Motion for Summary Judgment (ECF No. 60) filed by Defendants Patrick Communications, LLC ("PCL"); W. Lawrence ("Larry") Patrick; and Susan Patrick (collectively, "Defendants"). (*See* ECF No. 73.) In so doing, the Court (1) entered judgment for PCL on Counts I–II of Plaintiff's controlling First Amended Complaint; (2) entered judgment for all Defendants on Counts III & V of the First Amended Complaint; and (3) dismissed Count IV with prejudice. Now pending before the Court is Plaintiff's Motion to Alter or Amend Judgment Pursuant to Federal Rule 59 and Request for Oral Argument ("Rule 59(e) Motion") (ECF No. 75). The Court has carefully reviewed Plaintiff's Rule 59(e) Motion and has determined that additional briefing is unnecessary at this time; a hearing is likewise unnecessary, *see* Local Rule 105.6 (D. Md. 2014). The motion shall be DENIED.

Rule 59(e) of the Federal Rules of Civil Procedure provides that a "motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." Relief under Rule 59(e) is available on only three narrow grounds: "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence . . . or (3) to correct a clear error of

law or prevent manifest injustice." *Henson v. Santander Consumer USA, Inc.*, Civ. No. RDB-12-3519, 2015 WL 433475, at *2 (D. Md. Feb. 2, 2015) (citing *Gagliano v. Reliance Standard Life Ins. Co.*, 547 F.3d 230, 241 n.8 (4th Cir. 2008)), *aff'd*, 817 F.3d 131 (4th Cir. 2016). The United States Court of Appeals for the Fourth Circuit has cautioned that parties should not employ Rule 59(e) motions to "raise arguments which could have been raised prior to the issuance of the judgment." *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998). Reconsideration of a final order is an extraordinary remedy that must be applied sparingly, *id.*, and "mere disagreement" with a court's analysis "does not support a Rule 59(e) motion," *Hutchinson v. Staton*, 994 F.2d 1076, 1082 (4th Cir. 1993); *see also Projects Mgmt. Co. v. DynCorp Int'l, LLC*, 17 F. Supp. 3d 539, 541 (E.D. Va. 2014) ("[A] motion for reconsideration under Rule 59(e) is inappropriate if it asks the court to 'reevaluate the basis upon which it made a prior ruling' or 'merely seeks to reargue a previous claim.'" (citation omitted)), *aff'd*, 584 F. App'x 121 (4th Cir. 2014) (per curiam).

Here, Plaintiff identifies no change in controlling law, and he presents no previously unavailable evidence that has surfaced during the short period since the Court entered its judgment in this case. Rather, Plaintiff devotes the bulk of his motion to quibbling with the Court's treatment of certain facts and restating arguments he previously articulated (which arguments the Court considered and found deficient for the reasons explained at length in its prior Memorandum).

Plaintiff first complains that the Court's prior analysis of his breach-of-contract claim (Count I)[1] "focuses almost exclusively on the formation and capitalization" of NRJ TV, LLC

---

[1] Although in his motion Plaintiff requests a trial as to each count of the First Amended Complaint, nowhere in his brief does he discuss (much less contest) the Court's analysis with respect to Count II (*quantum meruit*), Count III (Maryland Wage Payment and Collection Law), or Count IV (declaratory judgment). Nor does Plaintiff contest the Court's analysis with respect to his ancillary claim for additional compensation relating to the WTVE transaction.

2

("NRJ" or the "NRJ Venture"). (ECF No. 75–1 at 3.) In fact, Plaintiff posits, he has "always maintained he was entitled to a commission on whatever PCL received or had a right to receive from the venture, which included both the equity in NRJ *and* any profits realized on sales at the spectrum auction." (*Id.*) But the Court recognized as much in Part I of its prior Memorandum, where it wrote that "Plaintiff began inquiring at an early stage about the possibility of receiving *either* equity in Drumcree[, LLC] *or* a cash payment upon final, post-auction liquidation of the NRJ Venture." (ECF No. 72 at 6 (emphasis added).) Likewise, the Court observed that "both Larry and Susan have consistently testified that they promised Plaintiff *neither* equity in Drumcree *nor* any kind of profit share in NRJ." (*Id.* at 7 (emphasis added).) The Court thoroughly comprehends Plaintiff's theory of the case, including his prayer for relief: the Court did not enter judgment for Defendants because the Court thought Plaintiff could not qualify for a particular type of relief but because Plaintiff *does not qualify for any relief at all*.

Next, Plaintiff cites a slew of e-mails, and a few other selections from the summary-judgment record, which he perceives as creating material questions concerning the nature of the Patricks' interest in the NRJ Venture and PCL's role in that venture. (*See* ECF No. 75–1 at 4-6.) Plaintiff discussed most of these documents, or portions of them, in his summary-judgment opposition brief, and the Court reviewed all of these documents while undertaking its prior analysis. The Court declines to rehash that analysis here. However, it makes several observations. First, many of the e-mails on which Plaintiff presently relies (and, more broadly, on which he relied during the prior round of briefing) were drafted during the infancy of negotiations between Larry Patrick and Ted Bartley. One might perhaps read these early e-mails to suggest that, initially, Larry and Bartley contemplated that PCL might receive a stake in the venture that would become NRJ (though a more plausible interpretation of these

e-mails is that Patrick and Bartley contemplated PCL might receive fees for brokerage services rendered, which is of course precisely what happened). But these early e-mails cannot be construed as establishing any kind of firm commitments through which Plaintiff could claim cognizable rights, *even if* the NRJ transaction were the type of transaction for which he was contractually entitled to receive commissions (it was not). Second, several of the later e-mails that Plaintiff cites actually undercut his notion that PCL (and Plaintiff himself, as a commissioned broker of PCL) enjoyed a profit stake in NRJ. For instance, in a February 26, 2011, e-mail to Bartley, Larry commented on PCL's "incentive . . . to find listings where [it] would be protected and paid a reasonable commission," while on March 3, 2011, Bartley noted that Plaintiff had invested significant time in spectrum repacks, which Bartley characterized as "non-revenue producing tasks." (ECF Nos. 66–6 at 71 & 71–1 at 1.)

The Court recognizes that at summary judgment, it must take the facts and *reasonable* inferences to be drawn therefrom in the light most favorable to the nonmoving party, *see Scott v. Harris*, 550 U.S. 372, 378 (2007). Had the Court's analysis with respect to Plaintiff's breach-of-contract claim ended with its survey of the various e-mails, the Court might have erred had it nevertheless granted judgment to PCL. But the Court's analysis did not end there: the Court identified additional, fatal defects in Plaintiff's breach-of-contract theory. The first such defect—which Plaintiff does not even acknowledge in his Rule 59(e) Motion—is that, early negotiations aside, PCL was *not* in fact apportioned an interest in the NRJ Venture. The NRJ operating agreement could not be clearer: Larry Patrick received a one-third equitable stake in NRJ at the time of formation, with his membership units allocated to Drumcree, LLC, a private investment vehicle that he and Susan control. (*See* ECF No. 61 at 46.) Neither the operating agreement nor the companion financing agreement between NRJ and Fortress Investment Group

identifies any services to be performed by PCL or compensation to be paid to PCL; for that matter, these agreements do not even *mention* PCL. Plaintiff's employment memorandum specifies that he was entitled to commissions on certain "collected fees paid to the Company." (ECF No. 60–10 at 59.) It follows, then, that if PCL received no value in relation to the NRJ transaction, Plaintiff was entitled to no commissions with respect to that transaction.

Even had PCL received some kind of remuneration relating to the NRJ transaction (whether in the form of cash, equity, or some future profit interest), which it plainly did not, Plaintiff *still* would not have been contractually entitled to a commission with respect to that transaction because the "NRJ Transaction was not the purchase or sale of a broadcast property. The NRJ Transaction was the creation, formation and funding of a new entity, NRJ, that had a business plan to purchase television stations" (ECF No. 60–15 at 10). Plaintiff's employment memorandum does not prescribe commissions for each and every activity that he undertook in his capacity as a salaried PCL employee; rather, it prescribes commissions for two discrete classes of transactions ("broadcast media transactions" and "telecom, wireless or tower transactions"). (ECF No. 60–10 at 59.) Although the employment memorandum does not define these terms, Defendants' expert, George R. Reed, explained that a "broadcast media transaction" is a transaction involving the "purchase or sale of a broadcast property, such as a radio or television station, and in certain transactions the arrangement of financing for the purchaser." (ECF No. 60–15 at 10.)[2] Crucially, Plaintiff's expert, Brian Byrnes, did not contradict that

---

[2] As the Court noted in its prior Memorandum, the NRJ transaction could *possibly* be construed as a type of financing transaction, though Defendants' expert—who floated the possibility that broadcast media transactions might involve financing arrangements—evidently did not believe that the NRJ transaction would so qualify. In any case, as the Court went on to observe, "Plaintiff's contribution to the NRJ Venture before Fortress and the NRJ Partners reached an agreement in principal was *de minimis*, and his contribution afterward . . . was keyed to specific transactions rather than to securing general funding or broad capital commitments." (ECF No. 72 at 14 n.19.) The Court elaborated on Plaintiff's *de minimis* role in Part III.B.3 of its prior Memorandum.

definition. In his report, Byrnes "wrote"[3] that the "purchase[] and subsequent sale of television stations owned by the NRJ entities . . . are 'broadcast-media transactions' as that term is commonly used and understood in the broadcast media brokerage industry" (ECF No. 66–4 at 7), while in his deposition, he testified that a "broadcast media transaction is where a station is purchased or sold, a broadcast station. That's it." (ECF No. 60–16 at 9.)[4] In his Rule 59(e) Motion, Plaintiff attempts to muddle the record by excerpting descriptions by Byrnes and Reed of what it means to "execute" a transaction. However, these excerpts focus on Plaintiff's contribution to the NRJ effort; they do not address the *nature* of the NRJ transaction (and whether it was the type of transaction that was compensable under Plaintiff's contract). Moreover, the tasks that Byrnes, in particular, attributes to Plaintiff are tasks primarily relating to NRJ's acquisition of television stations *after* the venture was a going concern: these were, indeed, broadcast media transactions, and Plaintiff was, indeed, compensated handsomely for his role in them, as the Court discussed in its prior Memorandum. (*See* ECF No. 72 at 6.) But merely by assisting his client, NRJ, with broadcast media acquisitions (and collecting hundreds of thousands of dollars in fees thereby), Plaintiff did not somehow become entitled to a percentage of the profits his client would eventually reap through its spectrum-arbitrage efforts.

Three remaining points require brief consideration. First, Plaintiff avers that the circumstances surrounding Bert Ellis's conflicting statements are graver than they appeared on summary judgment. The Court addressed the discrepancy between Ellis's 2015 affidavit and his 2016 declaration in footnote nine of its prior Memorandum, noting that Ellis attributed errors in the earlier document to strategic drafting choices by Plaintiff's counsel. Plaintiff now submits

---

[3] The Court previously called into question the evidentiary value of Byrnes's report, noting his sworn admission that Plaintiff's counsel supplied much of the language (not only for the "Factual Background" but also for the "Explanation of Opinions"). (*See* ECF No. 72 at 20 n.26.)

[4] Byrnes also agreed with defense counsel that mere formation of a company that may engage in the business of buying and selling television stations is not itself a broadcast media transaction. (*See* ECF No. 60–16 at 9-10.)

that "the language of the first affidavit was arrived at after several months of correspondence and multiple changes, including several drafts in which the language was determined by Mr. Ellis, not counsel to Plaintiff." (ECF No. 75–1 at 7.) Plaintiff contends that he "could not advise the Court that Mr. Ellis'[s] representations of the circumstances of execution of the initial affidavit were totally false" because "sur-replies are not permitted." (*Id.*) Plaintiff is only partially correct: although surreplies are disfavored in this District, the Court may grant leave to file a surreply under appropriate circumstances, *see* Local Rule 105.2(a) (D. Md. 2014). One such circumstance is where the "moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply." *Khoury v. Meserve*, 268 F. Supp. 2d 600, 605 (D. Md. 2003), *aff'd*, 85 F. App'x 960 (4th Cir. 2004) (per curiam). That is precisely the situation Plaintiff encountered here: Defendants proffered Ellis's 2016 declaration (inclusive of Ellis's retraction of certain aspects of his prior affidavit) as an exhibit to their reply brief. Had Plaintiff brought his concerns to the Court's attention, the Court likely would have disregarded *both* of Ellis's statements for purposes of its Rule 56 analysis—but the outcome would have been exactly the same, as none of Ellis's attestations were dispositive.

Second, Plaintiff posits that the Court, ostensibly in conducting its analysis with respect to his fraud claim, "drew inferences from the evidence in the record against the non-moving party." (ECF No. 75–1 at 8.) "If the evidence were scant," Plaintiff writes, "such a result might be justified, but here the evidence is substantial." (*Id.*) Yet this "substantial" evidence, which Plaintiff proceeds to cite, consists of self-serving statements in his affidavit (which are directly contradicted by admittedly also self-serving statements in the Patricks' affidavits and depositions) as well as a couple of highly ambiguous correspondences. In an e-mail dated November 9, 2010, Larry Patrick rejected Plaintiff's proposed "NRJ COMMISSION

AGREEMENT," noting that it "mis-state[d] several key facts." (ECF No. 66–6 at 80.) And in a letter, drafted by Plaintiff shortly after his exit interview, Plaintiff contended that the parties were "not able to agree on the NRJ investment deal"; that Larry supposedly "indicated that if [Plaintiff] had stayed [he] would have paid [him] 30% of the [liquidation] proceeds"; and that, for the time being, Plaintiff proposed the parties "agree to disagree on that matter." (*Id.* at 86-87.) Plaintiff surmises that, had Larry *truly* never promised him a portion of the NRJ proceeds, Larry would have protested more vociferously;[5] never mind Plaintiff's invitation that the two should "agree to disagree." Despite the anemic record, the Court *might* have considered allowing Plaintiff's fraud claim to proceed if (1) fraud claims were governed by the plaintiff-friendly preponderance-of-the-evidence standard and (2) Plaintiff had adduced legally sufficient evidence corresponding to *each* element of the tort. But as the Court explained in its prior Memorandum, fraud claims require clear-and-convincing evidence, the presence or absence of which the Court must take into account at the summary-judgment stage, *see Skrzecz v. Gibson Island Corp.*, Civ. No. RDB-13-1796, 2015 WL 370049, at *3 (D. Md. Jan. 27, 2015). Furthermore, fraud claims require—in addition to proof that the defendant made a knowing or reckless misrepresentation—proof that the defendant acted with fraudulent intent and that the plaintiff rightfully relied on the defendant's misrepresentation, suffering damages thereby. *Dean v. Beckley*, Civ. No. CCB-10-297, 2010 WL 3928650, at *4 (D. Md. Oct. 1, 2010). In its Memorandum, the Court explained that Plaintiff conflated the intent element with the misrepresentation element (a point Plaintiff does not address in his Rule 59(e) Motion); the Court

---

[5] In advancing this argument, Plaintiff relies for the first time on *Miller v. Cox*, 457 F.2d 700, 702 (4th Cir. 1972), a decades-old case in which the Fourth Circuit, citing Virginia law, explained that when one is accused of criminal conduct and fails to deny the same, such failure *may* be admissible in a criminal proceeding against him as "evidence of his acquiescence in its truth" (citation omitted). The Court need not dwell on the exceptionally strained link between *Miller* and the case at bar; it simply notes that Plaintiff could have presented his *Miller* argument in the underlying proceedings, and as such, the argument is not well taken at the Rule 59(e) stage. *See Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 404 (4th Cir. 1998) ("Rule 59(e) may not be used to raise new arguments or present novel legal theories that could have been raised prior to judgment.").

further explained that Plaintiff failed to demonstrate how the Patricks' supposedly false statements harmed him (another point Plaintiff does not address in his Rule 59(e) Motion). (*See* ECF No. 72 at 25-29.)  With at best a weak case for false statements, and with little more than speculation supporting the other elements of the tort, Plaintiff did not assemble a record from which a reasonable factfinder could identify clear-and-convincing evidence of fraud.  Had the Court, despite its misgivings, denied Defendants' summary-judgment motion as to Plaintiff's fraud claim, the Court would have forsaken its "affirmative obligation . . . to prevent factually unsupported claims . . . from proceeding to trial," *Cohen v. Miller*, Civ. No. WMN-15-1881, 2016 WL 3597573, at *2 (D. Md. July 5, 2016) (quoting *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003)).

   Plaintiff concludes his Rule 59(e) Motion with a quick reference to an argument he raised in his prior opposition brief, *i.e.*, that because PCL apparently paid him commissions for certain activities that were not broadcast media transactions but that nevertheless generated fees for PCL, he should therefore have received commissions in relation to the NRJ transaction.  (ECF No. 75–1 at 13.)  Plaintiff's argument is a non sequitur:  a benevolent employer is not hamstrung by its generosity, forced to pay extracontractual commissions on all revenue merely because it chooses to overcompensate its employees from time to time.  In any event, as the Court has by now made crystal clear, PCL received no value with respect to the formation of NRJ and is owed no percentage of NRJ's profits on liquidation, so PCL had no reason to pay Plaintiff a dime for his *de minimis* involvement with the NRJ transaction.

   Because Plaintiff has neither identified a change in controlling law nor adduced new, potentially dispositive evidence nor established that the Court's prior judgment was clearly erroneous or would otherwise work a manifest injustice, Plaintiff is entitled to no Rule 59(e)

relief.  *See Henson*, 2015 WL 433475, at *2.  Accordingly, the Court declines to alter or amend its judgment of June 13, 2016.

## **ORDER**

For the reasons stated herein, it is ORDERED:

1. Plaintiff's Rule 59(e) Motion (ECF No. 75) is DENIED; and

2. This case shall REMAIN CLOSED.

DATED this 25th day of July, 2016.

BY THE COURT:

_____/s/_____
James K. Bredar
United States District Judge